UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DORIS YANPING YAU,

        Plaintiff,

    v.

SAINT FRANCIS MEMORIAL
HOSPITAL, et al.,

        Defendants.

Case No.  13-cv-02558-DMR

**ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

Re: Dkt. No. 94

Plaintiff Doris Yau brings this employment discrimination action against Defendants Saint Francis Memorial Hospital ("St. Francis") and Dignity Health, asserting claims for race and national origin discrimination, retaliation for making complaints of discrimination, whistleblower retaliation, violation of California Health and Safety Code section 1278.5, and wrongful termination in violation of public policy.  Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  [Docket No. 83.]  Having carefully considered the parties' arguments, the relevant legal authority, and having had the benefit of oral argument, the court hereby grants in part and denies in part Defendants' motion.

**I. Facts & Background[1]**

Plaintiff, a Registered Nurse, began her employment at St. Francis in 1998.  She worked

---

[1] The background facts leading up to Plaintiff's termination are largely undisputed.  The court notes any disputes in the opinion where necessary.

The court notes that Defendants submitted Objections to Evidence in violation of the Court's local rules.  [Docket No. 106-1.]  Civil Local Rule 7-3(a) requires that "[a]ny evidentiary . . . objections to [a] motion be contained within the brief or memorandum."  N.D. Cal. Civ. L.R. 7-3(a).  If a party files objections in a separate document, the court will strike and disregard them.  *See, e.g., Ferretti v. Pfizer, Inc.*, No. 11-4486 LHK, 2013 WL 140088, at *1 n.1 (N.D. Cal. Jan. 10, 2013).  The court therefore strikes Defendants' Objections from the record.  The court will consider any evidentiary objections which the parties included in their briefs.  *See Lotes Co. v. Hon Hai Precision Indus. Co.*, No. 11-1036 JSW, 2012 WL 2917450, at *1 n.1 (N.D. Cal. July 17, 2012).

United States District Court
Northern District of California

primarily in the hospital's burn unit, a position she held from 1998 until her termination in June 2013. She returned to work in April 2014. From 2007 to 2010, Plaintiff's supervisor was Angela Gates, director of St. Francis's burn unit. Since March 2010, Plaintiff has reported to Paula Fillari. The parties do not dispute that Plaintiff has demonstrated strong job performance throughout her employment.

**A.       Plaintiff's Complaint Regarding the Consecutive Workday Policy**

St. Francis has a cooperative arrangement with its sister hospital, St. Mary's Medical Center ("St. Mary's"), that permits employees to work extra shifts at the two facilities under certain circumstances. In 2009, Gates became concerned about the number of Plaintiff's shifts and spoke to her on several occasions regarding her work schedule. During that year, Plaintiff regularly worked approximately 140 hours per two-week pay period, consisting of her regular 72-hour schedule at St. Francis (three 12-hours shifts per week) and overtime at both St. Francis and St. Mary's. In addition, she worked additional hours as a per diem nurse at California Pacific Medical Center ("CPMC"). In November 2009, Plaintiff received a verbal warning for failing to properly document a patient's pressure ulcer, and Gates became concerned that Plaintiff's error was the result of fatigue. Gates reported her concerns about Plaintiff's work schedule to St. Francis's Human Resources (HR) department. Barbara Morrissette, Vice President of HR, initiated a review of Plaintiff's time records for 2009 and discovered that Plaintiff stood out as having worked the most consecutive shifts. Between working at St. Francis and St. Mary's, and without taking into consideration her hours at CPMC, Plaintiff had worked more than eight consecutive days on ten occasions since January 2009. During one stretch Plaintiff worked 40 consecutive days without a break.

In December 2009, upon learning of Plaintiff's work schedule, St. Mary's prohibited her from working extra shifts at that facility. Between January and May 2010, the two hospitals worked to develop a policy limiting the number of consecutive shifts a direct patient care provider could work. In May 2010, St. Francis and St. Mary's implemented a consecutive workday policy prohibiting patient care providers from working more than seven consecutive 12-hour shifts or more than eight consecutive eight-hour shifts without at least 24 hours off between shifts. Once

United States District Court
Northern District of California

the new policy was in place, St. Mary's began scheduling Plaintiff and others so that they would not work more consecutive shifts than the policy allowed.

In January 2010, Plaintiff filed a charge of discrimination against St. Francis with the EEOC.  In her charge, Plaintiff alleged that St. Mary's had banned her from working at its facility without explanation, and stated that she believed that she had been discriminated against based on her race (Asian), national origin (Chinese), and sex.

On July 12, 2010, Fillari discovered that Plaintiff had violated the consecutive workday policy by working more than seven consecutive 12-hour shifts.  Morrissette scheduled a meeting with Plaintiff and her union[2] representative to discuss the policy.  However, the meeting was delayed for six days due to the CNA representative's unavailability, finally taking place on July 19, 2010, and Plaintiff was unable to return to work pending the meeting.  Plaintiff alleges that she was thus unlawfully suspended from work from July 13, 2010 until July 19, 2010.[3]

In August 2010, Plaintiff filed a second EEOC charge of discrimination against St. Francis. Plaintiff alleged race discrimination and retaliation for having filed her first EEOC charge.  She alleged that St. Francis had suspended her for "working more than eight (8) days" and that other non-Asian nurses were allowed to work more than eight consecutive days.  She also complained that she had been subjected to an HR investigation into allegations that she went to work sick in

---

[2] At all times, Plaintiff's employment was governed by the terms of a collective bargaining agreement ("CBA") between St. Francis and the California Nurses Association ("CNA").

[3] Defendants dispute that Plaintiff was suspended during this time; according to Defendants, Plaintiff was scheduled to work only three shifts during that six-day period.  Of those three shifts, Defendants paid Plaintiff for one missed shift.  For the remaining two, both of which were overtime shifts, Plaintiff would have been "called off" due to the hospital's low patient census. (Yau Dep. Ex. 7 (Oct. 22, 2010 Arbitration Transcript) 200-202.)

In October 2010, the parties participated in a union arbitration regarding the consecutive workday policy and Plaintiff's prohibition on working shifts at St. Mary's from December 2009 to May 2010.  The arbitrator ultimately determined that the hospital did not have the authority under the CBA to "outright bar her from working overtime at St. Mary's."  (Yau Dep. vol. I Ex. 9 (Arbitrator's Feb. 18, 2011 Opinion and Decision).)  After additional proceedings, the arbitrator determined that CNA had failed to establish that Plaintiff could have worked overtime at St. Mary's during that time period, taking into account that she would not have been allowed to work more than seven consecutive shifts.  (Yau Dep. vol. I Ex. 10 (Arbitrator's April 6, 2011 Opinion and Decision).)  The arbitrator also found that St. Francis had not violated the CBA with respect to the July 2010 "suspension" for Plaintiff's violation of the consecutive workday policy. (Arbitrator's Feb. 18, 2011 Opinion and Decision.)

United States District Court
Northern District of California

January 2010, that she had not been provided an opportunity to resolve the investigation, and that other nurses were not being investigated.[4]

**B.      Plaintiff's Patient Care Complaints**

Starting in 2010, Plaintiff began to be concerned about patient care and safety in the burn unit, and started making internal complaints through the hospital's internal event reporting system, known as "IVOS." From March 2010 through March 2013, Plaintiff submitted at least 15 IVOS event reports.[5] Plaintiff also made a number of complaints about patient care to directly to Fillari. According to Plaintiff, she never received any meaningful responses to her complaints; instead, Plaintiff contends that her complaints were often met with hostility or inaction. For example, in approximately January 2010, Gates responded to Plaintiff's report about a patient who did not receive enough fluids during the night and ended up on dialysis by scolding Plaintiff for allegedly talking behind another nurse's back.

In January 2012, Plaintiff filed a third EEOC charge against St. Francis. In her charge, Plaintiff alleged that since October 2010, St. Francis had implemented a language in the workplace policy, providing that employees had to speak English when performing their job duties, when in areas where patients or family members could overhear the conversation, and during breaks when in the presence of monolingual English speakers.[6] She alleged that St. Francis had not enforced the policy in an even-handed way, as several nurses were allowed to speak Tagalog but she was reprimanded when speaking Chinese. Additionally, Plaintiff alleged that Fillari had asked other nurses to monitor Plaintiff's use of Chinese and report their findings to her, and that St. Francis was using the policy to retaliate against Plaintiff for her prior EEOC charges.

---

[4] Defendants do not provide any evidence regarding the investigation referenced in the second EEOC charge, other than stating that the hospital ultimately declined to continue the investigation.

[5] Plaintiff submits a chart produced by Defendants labeled "Doris Yau Event Reports – 1/1/2009 through 3/31/15," which provides limited details about the IVOS reports. The actual event reports themselves are not part of the record.

[6] Defendants do not challenge the existence of the policy. The policy itself provides that its purpose is "[t]o eliminate barriers to effective communication among employees, patients, physicians, and visitors to the hospital," and states "[t]here is no limitation on languages spoken in lounges, locker rooms or dining rooms during non-work times, such as meal periods and rest periods." (Yau Dep. Ex. 63.)

United States District Court
Northern District of California

In July 2012, Plaintiff volunteered to serve on the hospital's Professional Practice Committee ("PPC") as a patient advocate for the burn unit.  She began voicing her concerns about patient care directly to the PPC, including raising issues about the lack of responses to the IVOS reports, but again found inadequate the response to her complaints.  In January 2013, Plaintiff believed that the care in the burn unit was becoming worse.  According to Plaintiff, the unit had been reduced from four physicians to only two, and in Plaintiff's opinion, one of the physicians lacked the experience to be able to oversee the entire unit on his own.  Plaintiff noticed that an unusually high number of patients were undergoing surgeries but were not healing as expected, requiring further surgeries.  Some patients became much worse or died, and Plaintiff believed that this was directly related to poor patient care.  Plaintiff continued to voice her concerns about patient care in the burn unit through IVOS, at PPC meetings, and directly to Fillari, but did not see the hospital take any corrective measures.

C.     **Plaintiff's Complaint to the California Department of Public Health & Defendants' Investigation of Plaintiff**

On approximately March 18, 2013, Plaintiff learned that one of the patients in the burn unit was scheduled for a leg amputation the following day.  Plaintiff was concerned about the course of treatment, because she had earlier heard the burn unit's senior physician state that the patient should not require an amputation.  Plaintiff also had doubts about the quality of care provided by the surgeon scheduled to perform the surgery.  Using her personal email account, Plaintiff drafted an email to the hospital's medical directors expressing her concerns about the patient and asking for immediate action to be taken, including requesting a surgical consultation before the amputation.  Plaintiff ultimately chose to submit her complaint through IVOS per hospital protocol, instead of sending the email.  To her disappointment, Plaintiff received no response to her request for action regarding the patient, and the patient underwent the amputation as scheduled.

On March 19, 2013, Plaintiff told her husband, Harry Xu, about the hospital's failure to respond to her IVOS report about the patient in question.  She had also regularly informed him about issues with patient care at St. Francis, and he encouraged her to contact California's Department of Public Health ("DPH") to complain.  Plaintiff, worried about retaliation by the

hospital, chose not to report the matter to the DPH.  However, Xu was able to access Plaintiff's draft email to the hospital's medical directors in Plaintiff's email account, and submitted it to the DPH as a complaint under his name, without Plaintiff's consent.  According to Plaintiff, Xu's complaint "contained no private healthcare information or patient identifying information," but did include "five examples of cases in which [Plaintiff] believed death or serious harm resulted to patients in the burn unit as a result of substandard medical care."[7]  (Yau Decl. ¶ 11.)  Upon learning that her husband had filed the complaint, Plaintiff contacted the DPH herself to provide further details, feeling "that the hospital may retaliate against me anyway due to my husband's complaint."  (Yau Decl. ¶ 12.)  Plaintiff subsequently filed two further complaints with the DPH, on May 14, 2013 and May 17, 2013.  On May 15, 2013, DPH investigator Lee Apfel contacted Plaintiff to ask for information about her complaints, and informed Plaintiff that the DPH would be conducting a formal investigation that week.

On May 10, 2013, around the time of Plaintiff's May 2013 DPH complaints, Plaintiff's supervisor, Fillari, logged into a patient's electronic medical record in order to respond to a records subpoena.  The record belonged to M.C., a burn unit patient who had been treated at the hospital in 2011.  Fillari noticed that on February 1, 2013, someone else had twice logged into the same patient file as "Unit Manager/Assistant Manager," which is a role that would apply to Fillari only for a burn unit patient.  This was suspicious to Fillari, since she was certain that she had not accessed the patient's file on that date.  Fillari then discovered that Plaintiff had accessed M.C.'s file on the date in question.[8]

On May 13, 2013, Fillari referred the matter to Karen Vickers, St. Francis's Director of Risk Services, Patient Relations, and Facility Privacy.  Mary Gaines, Director for Employee and Labor Relations, initiated an investigation with Vickers's assistance.  According to Vickers, she

---

[7] While Defendants do not dispute that Xu's complaint did not contain names of patients, they claim that the complaint contained sensitive patient information, including descriptions of the patients, including their ages and injuries, treating physicians, and courses of treatment.

[8] Fillari attaches to her declaration screenshots of her computer purportedly showing M.C.'s record, which she says show Plaintiff's name as the person who accessed the record on the date in question.  (Fillari Decl. ¶ 3 Ex. A.)  However, this document does not contain Plaintiff's name, and the dates listed on the record are all from April 2015.

United States District Court
Northern District of California

ran an audit of M.C.'s record on that day.  Vickers states that she concluded that Plaintiff had accessed M.C.'s medical record twice for at least two minutes on February 1, 2013, even though M.C. had last been treated in 2011.  (Vickers Decl. ¶ 22.[9])  Defendants contend that based on this information, Gaines determined that there was no legitimate reason for Plaintiff to access the records, and that such access was in violation of the Health Insurance Portability and Accountability Act ("HIPAA") of 1996, which provides national standards for safeguarding the privacy and data of an individual's protected health information.  Defendants also contend that such access was in violation of the hospital's privacy policies.[10]  Vickers later notified the DPH of a possible HIPAA violation, and also notified M.C.'s family of the breach as required under federal and state privacy laws.

On May 15, 2013, a DPH investigator came to St. Francis unannounced to investigate a patient care complaint.  Vickers met with the investigator and learned that the complaint had been filed by an individual named Harry Xu.  According to Vickers, she did not know Xu nor did she recognize him as someone who had a relationship to Saint Francis.  During Vickers's meeting with the investigator, she read Xu's complaint and recognized it as identical to a report that had

---

[9] Attached as Exhibit F to Vickers's Declaration is a report generated by Vickers on April 3, 2015 in response to a request from counsel which purports to be a "true and correct copy of the entire access history for patient M.C.'s electronic medical record, from December 2011 through December 2013."  (Vickers Decl. ¶ 22, Ex. F.)  According to Vickers, this report shows the dates and lengths of time of Plaintiff's access of M.C.'s record, as well as the date Vickers first accessed M.C.'s record for purposes of the investigation into Plaintiff's access.  However, although Plaintiff's name appears on the report, the report does not contain any discernable information about dates or times of access attempts.  Plaintiff objects to this exhibit, as well as to Exhibit G to Vickers's declaration, another purported report of Plaintiff's February 1, 2013 activities on the electronic medical record system, on the grounds that Vickers did not properly authenticate them.  The court agrees.  Vickers states in her declaration that on April 3, 2015, she "caused Exhibit F to be generated in response to a request from Plaintiff's counsel."  (Vickers Decl. ¶ 22.)  This statement is inadequate to establish that these reports are what Defendants claim them to be, as she does not explain the source of the information or how she generated the reports, nor does she set forth personal knowledge of the recordkeeping systems from which the reports were generated.  *See* Fed. R. Evid. 901(a).  Elsewhere she states "I ran the audit of M.C.'s record on Monday, May 13, 2013," (Vickers Decl. ¶ 11), but she does not attach the May 2013 audit, and does not describe how she "ran" the audit.  Plaintiff's objections to Exhibits F and G are therefore sustained.

[10] Pursuant to St. Francis's Standards of Conduct, "[f]ailure to observe the confidential nature of medical records and information including computer access" is "conduct which may result in disciplinary action up to and including discharge."  (Morrissette Decl., April 9, 2015, ¶ 9 Ex. B.)  Additionally, the Employee Handbook lists "[u]nauthorized verbal or written disclosure or release of information and/or records regarding our patients and/or operations" as grounds for termination without progressive discipline.  (Morrissette Decl. ¶ 9 Ex. D.)

United States District Court
Northern District of California

recently been submitted through IVOS and which the hospital was actively investigating.  Vickers states that at the time, she did not recall the employee who had submitted the same complaint via the IVOS system, but later determined that it was Plaintiff.  Vickers became concerned that a third party had obtained access to sensitive patient information, and informed Gaines.  During the course of the investigation, Vickers learned that Xu was Plaintiff's husband.

On June 3, 2013, Plaintiff met with Gaines, Vickers, Fillari, and two CNA representatives.  Plaintiff was informed that she was under investigation for two issues: 1) unauthorized access to M.C.'s medical record and 2) providing private patient health information to her husband.  In response to questions about accessing M.C.'s record, Plaintiff responded, "I have no memory," and did not provide any further information or explanation.  Plaintiff acknowledged that she had drafted her March 18, 2013 IVOS report on her personal email account, and then cut and pasted the text of the report into the IVOS system.  She also admitted that Xu had access to her email account, which contained her draft report.  According to Defendants, this constituted a violation of St. Francis's patient confidentiality policies.  At the same meeting, Plaintiff explained that she had never provided any private health information or patient identifying information to her husband, and that any information the DPH had beyond what was contained in Xu's complaint came from her directly after Xu filed the complaint.  She also stated that she had personally spoken with the DPH about her patient care concerns, including the concerns raised in her husband's March 19, 2013 complaint and the two subsequent complaints filed by Plaintiff.

On June 7, 2013, Plaintiff received a letter of termination from St. Francis, signed by Morrissette.  According to Defendants, Gaines made the decision to terminate her employment after consulting with Morrissette and Fillari.  In the termination letter, Morrissette informed Plaintiff that the reason for her termination was "that you accessed patient medical records without a business need to know (a reportable event under HIPAA) and you disclosed confidential patient information to a third party," and that her actions "violate our privacy policies and Dignity Health Standards of Conduct."  (Morrissette Dep. Ex. 13.)

In July 2013, following her termination, Plaintiff filed her fourth EEOC charge against St. Francis, alleging that the hospital "falsely accused [her] of violating HIPAA law and patient

privacy rules in two separate incidents," leading to her termination.  (Torner Decl. Ex. C (Yau

Dep. vol. II) Ex. 64.)  She stated that she was aware of other HIPAA and privacy violations

committed by similarly situated, non-Chinese and non-Asian colleagues that resulted in no

disciplinary action, and that she believed she had been discriminated against because of her race,

national origin, and in retaliation for her participation in protected activities.  On January 14, 2014,

Plaintiff filed a fifth EEOC charge, alleging St. Francis withheld salary owed Plaintiff at the time

of her termination, and that her "payroll issues were not resolved while similarly situated

employees of different races and national origins had their payroll issues resolved."  (Torner Decl.,

May 19, 2015, ¶ 2 Ex. N.)

   Plaintiff filed a grievance about her termination under the CNA contract.  Following an

arbitration hearing in February and March 2014, the arbitrator found that her termination was not

supported by just cause, and Plaintiff was reinstated in April 2014.  However, the arbitrator

declined to award back pay.  (Yau Dep. Ex. 11 (April 14, 2014 Arbitration Decision and Award)

5.)

## II. Procedural History

   On June 6, 2013, Plaintiff, proceeding pro se, filed a complaint against Defendants.  She

filed an amended complaint on March 1, 2014.  In November 2014, Plaintiff moved to substitute

counsel, which the court granted on November 12, 2014.  Upon leave of court, Plaintiff filed her

second amended complaint on December 12, 2014.  In this operative complaint, Plaintiff alleges

the following nine causes of action: 1) race discrimination under Title VII of the Civil Rights Act

of 1964 as amended, 42 U.S.C. § 2000e; 2) national origin discrimination under Title VII; 3)

retaliation for complaints of discrimination under Title VII; 4) race discrimination under

California's Fair Employment and Housing Act (FEHA), California Government Code section

12940 *et seq.*; 5) national origin discrimination under FEHA; 6) retaliation under FEHA; 7)

whistleblower retaliation in violation of California Labor Code section 1102.5; 8) violation of

California Health and Safety Code section 1278.5; and 9) wrongful termination in violation of

public policy.  Defendants move for summary judgment, or in the alternative, partial summary

judgment.

United States District Court
Northern District of California

### III. Legal Standard

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Id.* at 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### IV. Discussion

**A.    Whether Plaintiff Failed to Exhaust Administrative Remedies or Timely File Suit as to Claims Predating her June 2013 Termination**

Plaintiff's second amended complaint alleges twelve separate incidents of alleged discrimination and retaliation, including her June 2013 termination. Defendants argue that most of the incidents are barred due to Plaintiff's failure to exhaust administrative remedies or to timely file suit.

#### 1.    Administrative Exhaustion

"Under both Title VII and FEHA, exhaustion of administrative remedies is a prerequisite

to resort to the courts." *Leleind v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079, 1090 (N.D. Cal. 2008) (citations omitted).  Defendants argue that Plaintiff's complaint contains allegations about six incidents, none of which were expressly or impliedly referenced in any of her EEOC charges.  Defendants argue that they are therefore barred for failure to exhaust administrative remedies.  *See id.* ("[t]he scope of the administrative charge defines the scope of the subsequent civil action, and unlawful conduct not included in an administrative complaint is not considered by a court unless the conduct is like or reasonably related to the allegations in the administrative complaint, or can reasonably be expected to grow out of an administrative investigation.").  The six incidents include: 1) Plaintiff's alleged ban from working in the recovery unit from December 2009 to February 2010; 2) Gates allegedly "scolding" Plaintiff for "talking behind another nurse's back" in January 2010; 3) Defendants' alleged April 2010 use of a falsified statement to justify the St. Mary's ban; 4) the April 2010 initial denial of Plaintiff's Staff Nurse III renewal; 5) staffing decisions allegedly made in violation of the CBA since January 2010, resulting in lost work and income for Plaintiff; and 6) Defendants' alleged wrongful withholdings from Plaintiff's salary and payroll errors from July 2010 and February 2012.

Plaintiff did not address Defendants' arguments regarding these six incidents. Accordingly, to the extent any of Plaintiff's claims are based on these incidents, they are dismissed for Plaintiff's failure to exhaust administrative remedies.

### 2.    Statute of Limitations

Defendants also argue that with the exception of Plaintiff's June 7, 2013 termination, all other alleged incidents of discrimination and retaliation are time-barred because Plaintiff did not timely file suit.  Prior to her termination, Plaintiff filed three EEOC charges.  She filed the last one on January 3, 2012, challenging Defendants' enforcement of the English-only language policy. On March 4, 2013, the EEOC consolidated its investigation and issued a right-to-sue notice as to Plaintiff's first three charges.  Plaintiff was required to file suit within 90 days from the date of receipt of the notice.  42 U.S.C. § 2000e-5(f)(1); *Payan v. Aramark Mgmt. Servs. Ltd. P'ship*, 495 F.3d 1119, 1121 (9th Cir. 2007).  The 90 day period "is a statute of limitations," and "if a claimant fails to file the civil action within the ninety-day period, the action is barred." *Nelmida v. Shelly*

*Eurocars, Inc.*, 112 F.3d 380, 383 (9th Cir. 1997).  The statute of limitations begins to run on the date that the notice arrived at the claimant's address of record.  *Payan*, 495 F.3d at 1122 (citations omitted).  Under Ninth Circuit law, right-to-sue notices are presumed to have been received within three days of mailing.  *Payan*, 495 F.3d at 1125.  Therefore, according to Defendants, since the notice was issued on March 4, 2013, Plaintiff was presumed to have received the notice on March 7, 2013, and her 90-day deadline to sue was June 5, 2013.  Plaintiff did not file suit until June 6, 2013, one day later.  Accordingly, Defendants argue that with the exception of claims arising from her termination, all of Plaintiff's earlier claims are time barred because she did not timely file suit.

Plaintiff does not deny that she received the notice, nor does she challenge the March 4, 2013 mailing date.  *See Payan*, 495 F.3d at 1123 ("[w]e begin with the presumption that the letter issuance date is also the date on which the letter was mailed.").  Therefore, in order to rebut the presumption that she received the right-to-sue notice by March 7, 2013 and establish that her complaint was timely, Plaintiff "must show that she did not receive the EEOC's right-to-sue letter in the ordinary course."  *See id.* at 1126.  Absent corroborating evidence, Plaintiff's testimony regarding when she received the notice must be "sufficiently definite . . . to conclude that the right-to-sue letter arrived more than three days after issuance by the EEOC."  *See id.* at 1127.

Plaintiff states that "[o]n the date that I received [the right-to-sue notice], I counted out 90 days from that date on a calendar and marked June 6, 2013 as the 90th day, and filed my complaint on that day."  (Yau Decl. ¶ 31.)  She does not provide any further details about her receipt of the document or how she counted the 90 days, nor does she verify that she correctly counted the 90 days.  Most importantly, Plaintiff does not identify the specific date she received the notice.[11]  Absent proof of the actual date Plaintiff received notice or additional details about her calculation of the filing deadline, the court finds that Plaintiff's testimony is not "sufficiently definite" to conclude that the right-to-sue notice arrived after March 7, 2013.  *See, e.g., Samiere v.*

---

[11] Plaintiff also cites *Stimson v. Potter*, No. C 05-0411 PJH, 2006 WL 449133, at * 3 (N.D. Cal. Feb. 22, 2006), for the proposition that EEOC right-to-sue notices are not deemed received until five days after mailing, which would make Plaintiff's filing deadline June 7, 2013, the day after she filed suit.  However, the Ninth Circuit has specifically rejected the five-day presumption applied in *Stimson*.  *See Payan*, 495 F.3d at 1125 n.5 (discussing *Stimson*).

1  *San Francisco United Sch. Dist.*, No. C 07-1217 PJH, 2007 WL 2947424, at *2 (N.D. Cal. Oct. 9,

2  2007) (describing evidence required to support claim that right-to-sue notice was received after

3  presumptive three days after issuance, explaining "[plaintiff] must state how she received the

4  letter-whether it was placed in her mailbox, or she received it some other way-and the date she

5  received the letter.  She must state whether she knows the date the letter arrived at her building,

6  and if so, what that date was. . . . In addition, she should state any other facts that she has which

7  bear on the issue.").  Therefore, applying the three-day presumption of receipt, Plaintiff's deadline

8  to sue was June 5, 2013.  Plaintiff's complaint, which was filed on June 6, 2013, was not timely

9  filed.[12]  *See Payan*, 495 F.3d at 1127 (affirming summary judgment where plaintiff filed suit three

10  days beyond the 90 day period; noting plaintiff's "pro se status does not afford her different

11  treatment under these standards.").

12        Plaintiff argues that her failure to timely file her lawsuit should be excused because she

13  was misled by the EEOC regarding her claims.  "An equitable exception to the exhaustion

14  requirement is available when an EEOC representative misleads the plaintiff concerning his

15  claim."  *Josephs v. Pac. Bell*, 443 F.3d 1050, 1061 (9th Cir. 2005).  In order to harbor within this

16  exception, Plaintiff must show that she "(1) diligently pursued [her] claim; (2) was misinformed or

17  misled by the administrative agency responsible for processing [her] charge; (3) relied in fact on

18  the misinformation or misrepresentations of that agency, causing [her] to fail to exhaust his

19  administrative remedies; and (4) was acting pro se at the time."  *Id*.  Plaintiff has not submitted

20  any evidence that the EEOC misinformed her or misled her or that she relied on such

21  

22  [12] At the hearing, Plaintiff for the first time argued that her complaint was timely filed under
*Payan* and Federal Rule of Civil Procedure 6 based on a slightly different calculation.  According

23  to Plaintiff, the court should measure 90 days from March 4, 2013, the date the right-to-sue notice
was issued.  Ninety days from March 4, 2013 was June 2, 2013, a Sunday.  Plaintiff contends that

24  pursuant to Rule 6, the 90-day time period "continue[d] to run until the end of the next day that is
not a Saturday, Sunday, or legal holiday," Fed. R. Civ. P. 6(a)(1)(C); here, Monday, June 3, 2013.

25  According to Plaintiff, adding *Payan*'s three-day presumption of receipt to June 3, 2013 results in
a June 6, 2013 deadline to file suit, rendering her complaint timely.  In other words, Plaintiff asks

26  the court to measure the start of the limitations period from the date the right-to-sue notice was
issued, and then add three days for mailing.  This method of calculation is contrary to *Payan*, in

27  which the Ninth Circuit explicitly stated that courts "measure the start of the limitations period
from the date on which a right-to-sue notice letter arrived at the claimant's address of record."

28  495 F.3d at 1122.  Here, in the absence of evidence of the actual date Plaintiff received the notice,
the court must measure the limitations period from the presumptive receipt date of March 7, 2013.

1    misinformation.  Plaintiff states that prior to the date she received the right-to-sue notice, she "had

2    spoken on a regular basis to intake personnel at the EEOC who assured [her] they were

3    investigating all of [her] complaints together, and that the investigation was still continuing."

4    (Yau Decl. ¶ 31.)  Plaintiff does not explain how these statements, made *before* the issuance of the

5    right-to-sue notice, were misleading or incorrect; the record contains no evidence of any

6    statements or misrepresentations by the EEOC *after* the issuance of the right-to-sue notice.

7        Accordingly, the court finds that with the exception of claims arising from her termination,

8    all of Plaintiff's earlier claims are time barred because she did not timely file suit.[13]

9    **B.    Plaintiff's Remaining Claims**

10       **1.    Claims Against Defendant Dignity Health**

11       Defendants argue that the remaining Title VII and FEHA claims based on Plaintiff's

12   termination can only be brought against St. Francis, and cannot be asserted against Dignity Health

13   because it was not named as a defendant in any of Plaintiff's EEOC charges.

14       In general, "Title VII claimants may sue only those named in the EEOC charge because

15   only they had an opportunity to respond to charges during the administrative proceeding."  *Sosa v.*

16   *Hiraoka*, 920 F.2d 1451, 1458 (9th Cir. 1990); *see also Cole v. Antelope Valley Union High Sch.*

17   *Dist.*, 47 Cal. App. 4th 1505, 1511 (1996) ("[i]n order to bring a civil lawsuit under the FEHA, the

18   defendants must have been named in the caption or body of the DFEH charge.").  "Title VII

19   charges can be brought against persons not named in an EEOC complaint as long as they were

20   involved in the acts giving rise to the EEOC claims.  Further, where the EEOC or defendants

21   themselves should have anticipated that the claimant would name those defendants in a Title VII

22

23   [13] Plaintiff also argues that pursuant to the continuing violations doctrine, the court should
     consider all of the incidents in her EEOC charges for purposes of liability and damages,
24   notwithstanding her failure to timely file suit on the first three EEOC charges.  Under the
     continuing violations doctrine, "an employer is liable for actions that take place outside the
25   limitations period if these actions are sufficiently linked to unlawful conduct that occurred within
     the limitations period."  *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1056 (2005).  This
26   doctrine is an "equitable exception" to the requirement that an employee timely file an
     administrative complaint based on violations of FEHA or Title VII.  *See Morgan v. Regents of*
27   *Univ. of Cal.*, 88 Cal. App. 4th 52, 63-64 (2000) (quotation marks and citation omitted).  Plaintiff
     offers no support for her position that the continuing violations doctrine is applicable to incidents
28   for which an aggrieved person has filed a timely charge of discrimination but failed to timely file
     suit in court after receiving a right-to-sue notice.

United States District Court
Northern District of California

1    suit, the court has jurisdiction over those defendants even though they were not named in the

2    EEOC charge." *Sosa*, 920 F.2d at 1458–59 (citations and internal quotations omitted).

3         Here, Defendants assert that Mary Gaines made the decision to terminate Plaintiff.  In her

4    declaration, Gaines states that she is the former "Service Area Director for Employee and Labor

5    Relations for Dignity Health."  (Gaines Decl., April 9, 2015, ¶ 1.)  At the hearing, defense counsel

6    conceded that Gaines was a Dignity Health employee.  Therefore, it is undisputed that Dignity

7    Health was "involved in the acts giving rise to the EEOC claims."  *See Sosa*, 920 F.2d at 1458-59.

8    Further, the record contains evidence that Dignity Health received actual notice of at least three of

9    Plaintiff's five EEOC charges, (*see* Alba Decl., April 6, 2015, ¶¶ 3, 4), suggesting that it should

10   have anticipated being named in Plaintiff's suit and that it was not prejudiced by Plaintiff's

11   omission.  *See also DelGiacco v. Cox Comm'ns*, No. SACV 14-0200 DOC(DFMx), 2015 WL

12   1535260, at *12 (C.D. Cal. April 6, 2015) (holding reference to two corporate entities in DFEH

13   charge sufficiently broad to include subsidiaries under FEHA, in part because all entities received

14   actual notice of charge).  Therefore, the court finds that Dignity Health is subject to suit in this

15   case.[14]

16        **2.    Race and National Origin Discrimination Claims**

17        As discussed above, the only remaining bases of liability for Plaintiff's race and national

18   origin discrimination claims are Plaintiff's termination and Defendants' failure to pay Plaintiff

19   overtime in 2013.

20        Courts apply the burden-shifting framework articulated by the Supreme Court in

21   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), to claims of discrimination

22

23   [14] The court also notes that testimony by Defendants' corporate representatives regarding the
     relationship between Dignity and St. Francis is far from clear.  Charlene Battaglia, a Rule 30(b)(6)

24   witness, testified that "Dignity is the employer.  Saint Francis is one of the members of Dignity,"
     but also testified that she was "an employee of St. Francis Hospital."  (Debski Decl. Ex. C

25   (Battaglia Dep.) 20.)  Morrissette testified that St. Francis has "a management contract" with
     Dignity Health, but that "Saint Francis has an independent fiduciary board."  (Debski Decl. Ex. A

26   (Morrissette Dep.) 10.)  Gaines testified that "Dignity Health is the corporate entity," or the
     "parent" to 40 hospitals including St. Francis.  (Debski Decl. Ex. B (Gaines Dep.) 13.)  Given this

27   unclear and inconsistent testimony, Plaintiff's point that she cannot have been expected to
     understand the relationship between the two entities is well taken.  *See Sosa*, 930 F.2d at 1458

28   ("EEOC charges must be construed with utmost liberality since they are made by those
     unschooled in the technicalities of formal pleading." (citation and quotation marks omitted)).

United States District Court
Northern District of California

1    based on disparate impact brought under Title VII and FEHA. *Guz v. Bechtel Nat'l Inc.*, 24 Cal.

2    4th 317, 355-56 (2000) (applying *McDonnell Douglas* framework in age discrimination claim

3    brought under FEHA); *see also Metoyer v. Chassman*, 504 F.3d 919, 941 (9th Cir. 2007)

4    ("California courts apply the Title VII framework to claims brought under FEHA." (citing *Guz*, 24

5    Cal. 4th at 354)).  The *McDonnell Douglas* test "reflects the principle that direct evidence of

6    intentional discrimination is rare, and that such claims must usually be proved circumstantially."

7    *Guz*, 24 Cal. 4th at 354.

8          In the first step of the *McDonnell Douglas* test, the plaintiff must establish a *prima facie*

9    case of discrimination, the elements of which may vary depending on the particular facts.  *Id.* at

10   355.  Generally, to establish a *prima facie* case, the plaintiff must show: "(1) [plaintiff] was a

11   member of a protected class, (2) [plaintiff] was qualified for the position [he or she] sought or was

12   performing competently in the position [he or she] held, (3) [plaintiff] suffered an adverse

13   employment action, such as termination, demotion, or denial of an available job and (4) some

14   other circumstance suggests discriminatory motive."  *Id.* (citing *Nidds v. Schindler Elevator Corp.*,

15   113 F.3d 912, 917 (9th Cir. 1996)).  "While the plaintiff's prima facie burden is 'not onerous,' he

16   must at least show 'actions taken by the employer from which one can infer, if such actions remain

17   unexplained, that it is more likely than not that such actions were 'based on a [prohibited]

18   discriminatory criterion.'"  *Guz*, 24 Cal. 4th at 355 (alteration in original) (internal citations and

19   quotation marks omitted).

20         If the plaintiff makes the required showing at the first step, "a presumption of

21   discrimination arises."  *Id.* at 355.  The burden then "shifts to the employer to rebut the

22   presumption" by articulating a "legitimate, nondiscriminatory reason" for the adverse employment

23   action.  *Id.* at 355-56.  Finally, in the third step, if the employer rebuts the presumption of

24   discrimination, "[t]he plaintiff must then have the opportunity to attack the employer's proffered

25   reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive.  In

26   an appropriate case, evidence of dishonest reasons, considered together with the elements of the

27   prima facie case, may permit a finding of prohibited bias."  *Id.* at 356.  A "plaintiff may establish

28   pretext either directly by persuading the court that a discriminatory reason more likely motivated

                                                    16

the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (internal quotation marks omitted).  If a plaintiff uses circumstantial evidence to satisfy this burden, "such evidence of 'pretense' must be 'specific' and 'substantial' in order to create a triable issue."  *Id.* at 1222.  "An employee in this situation cannot simply show the employer's decision was wrong, mistaken, or unwise."  *Morgan v. Regents of the Univ. of Cal.*, 88 Cal. App. 4th 52, 75 (2000) (internal quotation marks omitted).  "Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence . . . and hence infer that the employer did not act for the . . . non-discriminatory reasons."  *Id.* (internal quotation marks and citation omitted).

For purposes of this motion, Defendants admit that Plaintiff can establish a prima facie case.  Therefore, the burden shifts to Defendants to rebut the presumption of unlawful discrimination by producing admissible evidence that its actions were taken for a legitimate, nondiscriminatory reason.  Defendant has done so by presenting evidence that Plaintiff was terminated for accessing M.C.'s record without a business need to know and for disclosing confidential patient information to her husband, violating Defendants' privacy policies.  Therefore, the burden shifts back to Plaintiff to attack Defendants' reasons for her termination as pretexts for discrimination or offer any evidence of discriminatory motive.

Plaintiff presents no direct evidence of discriminatory motive.[15]  Accordingly, she must present "specific" and "substantial" evidence of pretense in order to create a triable issue.  *See Godwin*, 150 F.3d at 1222.  As discussed further below regarding her whistleblower claims, Plaintiff argues that the reasons offered by Defendants for her termination are pretextual, and that the real reason for her termination was retaliation for her internal complaints and her DPH

_____

[15] In fact, at the March 2014 arbitration, when asked if she believed that Gaines, whom Defendants contend made the termination decision, or Vickers, who investigated Plaintiff's alleged privacy violations, "ha[d] any sort of bias against [her]," Plaintiff responded "I don't think they have bias against me."  (March 26, 2014 Arbitration Tr. 277.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1    complaints regarding patient care and safety.  However, she does not identify any evidence to

2    support her claim that her termination was due to race or national origin discrimination.  She also

3    does not discuss the claim that her "payroll issues were not resolved while similarly situated

4    employees of different races and national origins had their payroll issues resolved."  As the

5    California Supreme Court has cautioned, "an inference of intentional discrimination cannot be

6    drawn solely from evidence, if any, that the company lied about its reasons" for an adverse

7    employment action.  *Guz*, 24 Cal. 4th at 360.  "[T]here must be evidence supporting a rational

8    inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause*

9    of the employer's actions."  *Id*. at 361 (emphasis in original).

10        In her briefing, the only references Plaintiff makes to race or national origin discrimination

11   are in passing or are speculative.  For example, Plaintiff states that she is aware of other non-Asian

12   nurses who violated HIPAA but were not terminated, but does not identify any particular

13   individuals.  Although Plaintiff argues that her own discipline was "unprecedented," she does not

14   identify the races or national origins of any of the employees who were disciplined short of

15   termination and thus treated more favorably.[16]  Plaintiff also states that in response to her

16   complaints, St. Francis "treated [Plaintiff] differently than similarly situated white nurses."  (Pl.'s

17   Opp'n 16.)  It is not clear whether Plaintiff is referring to her EEOC charges or her internal

18   complaints regarding patient care, or both, but in any event, Plaintiff does not identify these

19   comparators, the circumstances of their treatment by Defendants, or the details of their complaints.

20        The only other reference Plaintiff makes to race or national origin discrimination is the

21   2010 prohibition on her working additional shifts at St. Mary's.  Plaintiff states that she "had an

22   impeccable patient care history despite her long work hours," so "felt that something else was

23   motivating the hospital to single her out."  (Pl.'s Opp'n 10.)  Notwithstanding the fact that this

24   claim is barred for Plaintiff's failure to timely file suit, Defendants have offered a

25   _____

26   [16] Plaintiff identifies the race/national origin of only one of the disciplined employees, a
     Vietnamese employee who was terminated for accessing patient records "for personal reasons"
27   then lying about it during an investigatory meeting.  However, she does not explain how the
     circumstances of this employee's termination support her discrimination claims, arguing only that
28   the circumstances of the employee's termination "could not be further from Ms. Yau's situation."
     (Pl.'s Opp'n 26-27.)

1    nondiscriminatory reason for the ban (concern about Plaintiff's excessive hours), and Plaintiff's

2    contention that "something else"—i.e., unlawful discrimination—motivated the ban is pure

3    speculation.

4         At the hearing, the court asked Plaintiff's counsel to identify any other evidence in the

5    record to support her claims that the stated reasons for her termination were pretext for unlawful

6    discrimination based on race or national origin.  Counsel identified only the hospital's 2010

7    implementation of its workplace language policy.  This claim is also time-barred, but even if the

8    court considers it solely as background evidence of discrimination, the record contains no

9    evidence to support Plaintiff's claim that St. Francis enforced the language policy in a

10   discriminatory way or that the policy was unfairly directed at Asian and/or Chinese employees.  In

11   sum, Plaintiff identifies no evidence to support her claim that her race or national origin was "a

12   substantial factor motivating the adverse employment action."  *Harris v. City of Santa Monica*, 56

13   Cal. 4th 203, 225 (2013).

14        As Plaintiff has failed to present a triable issue of fact regarding her ultimate burden of

15   persuasion on the issue of discriminatory termination or failure to pay earned overtime, the court

16   grants summary judgment on Plaintiff's first, second, fourth, and fifth claims for race and national

17   origin discrimination in favor of Defendants.

18        **3.     Title VII and FEHA Retaliation Claims**

19        Plaintiff's third and sixth claims are for retaliation for filing EEOC charges.  Again, the

20   only potentially actionable adverse actions underlying her retaliation claims are her termination

21   and Defendants' failure to pay her overtime in 2013.

22        Under Title VII, employers may not take any adverse employment action against an

23   employee who has 1) opposed any practice made unlawful by Title VII or FEHA; or 2) "made a

24   charge, testified, assisted, or participated in any manner in any investigation, proceeding, or

25   hearing" under Title VII.  42 U.S.C. § 2000e-3(a).  Similarly, FEHA prohibits employers from

26   retaliating against any employee for opposing any practices forbidden by FEHA or "because the

27   person has filed a complaint, testified, or assisted in any proceeding" under FEHA.  Cal. Gov't

28   Code § 12940(h).  Claims for retaliation under Title VII and FEHA are analyzed under the

United States District Court
Northern District of California

*McDonnell Douglas* framework. *Leiland*, 576 F. Supp. 2d at 1094 (citations omitted). "To state a prima facie case for retaliation, plaintiff must establish: (1) she was engaged in protected activity; (2) defendant took an adverse employment action; and (3) a causal connection existed between plaintiff's protected activity and defendant's adverse employment action." *Id.* Under FEHA, Plaintiff must also establish that unlawful retaliation was "a substantial factor motivating the adverse employment action." *Harris*, 56 Cal. 4th at 225; *see also* CACI 2505 ("Retaliation—Essential Factual Elements").

There is no dispute that Plaintiff engaged in the protected activity of filing EEOC charges prior to her termination. Plaintiff filed charges alleging unlawful discrimination and/or retaliation in January 2010, August 2010, and January 2012. However, Defendants dispute whether Plaintiff can establish a causal connection between her protected activity and the adverse employment actions at issue (termination and alleged payroll issues). Defendants argue that Plaintiff cannot demonstrate sufficient temporal proximity between the adverse employment actions and the EEOC charges, since the periods of time between the EEOC charges and her allegedly retaliatory termination in June 2013 are "simply too attenuated to give rise to a causal link." (Defs.' Mot. 23.) *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1035 (9th Cir. 2006) ("[c]ausation sufficient to establish the third element of the prima facie case [for retaliation] may be inferred from . . . the proximity in time between the protected action and the allegedly retaliatory employment decision." (citation and quotation marks omitted)).

Plaintiff argues only that "she was subjected to a continuous and escalating pattern of retaliatory treatment by Defendants since she first started complaining in 2010," and that in response to her complaints, St. Francis "treated [Plaintiff] differently than similarly situated white nurses." (Pl.'s Opp'n 16.) This is insufficient to establish the requisite causal connection between her protected activity and the adverse employment actions. Plaintiff does not present any record evidence that the individuals involved in the decision to terminate her employment were aware of her EEOC charges. Moreover, the gap between her EEOC charges and her June 2013 termination is too great to support an inference that her complaints caused her termination.

At the hearing, Plaintiff highlighted an email she sent to Defendants in July 2010

discussing her complaints of discrimination and retaliation.  (Yau Dep. vol. I Ex. 28.)  In the email, which is addressed to "Lloyd Dean," Plaintiff states that she "ha[s] been a victim of discrimination at SFMH since December 2009," and asks whether the "core values of justice, dignity, respect, excellence, and stewardship" are "reserved for the white managers only." However, Plaintiff does not explain who Mr. Dean is, and there is no evidence that he was involved in the decision to terminate Plaintiff.  Further, the email cited is incomplete, as it appears to be missing its second page.  Even if the court construed this email as evidence that the relevant decision makers were aware that she had complained of discrimination, Plaintiff was not terminated until three years after she sent the email.  Because Plaintiff has failed to submit evidence establishing a causal link between her complaints of discrimination and her termination, the court concludes that she has failed to establish a dispute of fact as to whether her termination was in retaliation for protected activity under Title VII and FEHA.  Accordingly, the court grants summary judgment on Plaintiff's Title VII and FEHA retaliation claims.[17]

### 4.    Whistleblower and Wrongful Termination Claims

#### a.    California Labor Code section 1102.5

Plaintiff's seventh cause of action is for whistleblower retaliation in violation of California Labor Code section 1102.5.  Plaintiff alleges that she was "engaged in a protected activity when she complained to the Department of Public Health regarding patient care and safety issues."  (2d Am. Compl. ¶ 82.)  At the hearing, Plaintiff confirmed that this claim is solely based on the allegation that she engaged in protected activity by filing complaints with DPH.

Section 1102.5 prohibits an employer from retaliating against an employee for disclosing information "to a government or law enforcement agency . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."  Cal. Lab. Code § 1102.5(b).

---

[17] Since the underlying claims of discrimination and retaliation fail, Defendants are also granted summary judgment on Plaintiff's claim for wrongful termination in violation of public policy to the extent that it is based on unlawful discrimination and retaliation under Title VII and FEHA. (*See* 2d Am. Compl. ¶¶ 92, 93.)

United States District Court
Northern District of California

A plaintiff may prove a section 1102.5 retaliation claim with either circumstantial or direct evidence. *Mokler v. Cnty. of Orange*, 157 Cal. App. 4th 121, 138 (2007).  To prove a claim with circumstantial evidence, the plaintiff must first establish a prima facie case, which requires that she show that (1) she engaged in a protected activity; (2) her employer subjected her to an adverse employment action; and (3) there is a causal link between the two.  *Id.*  "An employee engages in protected activity when she discloses to a governmental agency 'reasonably based suspicions' of illegal activity." *Id.* (quoting *Green v. Ralee Engineering Co.*, 19 Cal. 4th 66, 86-87 (1998) (quotation marks omitted).  Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to produce evidence of a "legitimate, nonretaliatory explanation for its acts." *Mokler*, 157 Cal. App. 4th at 138.  If the employer meets this requirement, the plaintiff must show that the explanation is a pretext for retaliation.  *Id.*; *Patten v. Grant Joint Union High Sch. Dist.*, 134 Cal. App. 4th 1378, 1384 (2005).  Pursuant to section 1102.6, "once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor" in the alleged retaliatory action, "the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5."  Cal. Labor Code § 1102.6.

Neither party addresses the elements of Plaintiff's prima facie case.  However, it appears that Defendants do not dispute that Plaintiff's complaints to the DPH constituted protected activity.  Defendants terminated Plaintiff shortly after she revealed her complaints to Gaines, Vickers, and Fillari in the June 3, 2013 meeting.  (*See* Yau Decl. ¶¶ 16, 18 ("I specifically mentioned that I had personally spoken to the California Department of Public Health about my patient care concerns.").)  Given that the termination occurred shortly after the hospital (including Gaines, the purported decision maker) learned of her DPH complaints, the court finds that Plaintiff has established a triable issue of fact as to a causal link between the protected activity and her termination.  *See Patten*, 134 Cal. App. 4th at 1390 (concluding that "series of acts on [the defendant's] part—proceeding in linear fashion from [the plaintiff's protected activity] and culminating in her transfer . . .—presents a triable issue of material fact as to a 'causal link'

between the protected activity and the adverse employment action."); *Morgan*, 88 Cal. App. 4th at 69 (2000) (causal link may be established by circumstantial evidence such as proximity in time between protected activity and alleged retaliation). Therefore, the burden shifts to Defendants to offer a "legitimate, nonretaliatory explanation for its acts."

As discussed, Defendants assert that Plaintiff was terminated for accessing patient records without a medical need to know, as well as disclosing confidential patient information to a third party. Plaintiff argues that Defendants' proffered reason is pretextual. First, Plaintiff asserts that the hospital began investigating her for alleged HIPAA violations just two days *after* it became aware of the DPH investigation into Plaintiff's complaint. However, the evidence does not support this. Vickers states that Fillari asked her to run an audit on access to M.C.'s record on May 13, 2013, and that she did so that same day. She also states that she learned of Xu's DPH complaint and recognized it as identical to an internal IVOS report on May 15, 2013, *after* she began investigating Plaintiff's access of M.C.'s record.

In support of her position, Plaintiff cites a May 17, 2013 letter from the DPH confirming receipt of her complaint; a June 18, 2013 email from Gaines to Plaintiff's union representative setting forth the reasons for Plaintiff's termination; a May 17, 2013 email from Morrissette to Vickers and Fillari regarding the investigation into Plaintiff; and portions of Fillari's deposition. None of the cited evidence contradicts Defendants' assertion that it began investigating Plaintiff's access of M.C.'s record before they learned of the DPH complaint.[18]

As further evidence of pretext, Plaintiff argues that Defendants did not conduct a good faith investigation into the alleged HIPAA violation, and instead seized the opportunity to terminate her in retaliation for her DPH complaints. Plaintiff asserts that there is a plausible, alternative explanation for Plaintiff's purported access of M.C.'s record, and that Defendants' sole documentary evidence to support the alleged access is a series of conflicting "audit logs" that are unreliable and lack foundation. According to Plaintiff, it is possible that another nurse accessed

---

[18] It bears noting that this chronological analysis comes out differently when evaluating Plaintiff's claim under California Health & Safety Code section 1278.5, discussed below. For that claim, the fact finder can consider Plaintiff's internal safety complaints, not just the ones she made to DPH. Her internal safety complaints clearly predated Defendants' investigation into Plaintiff's alleged privacy violations.

M.C.'s record using Plaintiff's log-in and password.  Plaintiff submits evidence that it was common practice in the burn unit for nurses or managers to step away from a computer briefly, simply minimizing their medical record access session without logging off, and for other nurses to then use the same computer to access a patient record under someone else's log-in.  (Yau Decl. ¶ 23.)  She submits declarations from five current or former coworkers in which they describe this practice, and state that they were trained by the hospital to minimize their logged-in sessions when it was necessary to step away from their computers for a short time.  (Hom Decl., Feb. 3, 2014, ¶¶ 5-7; Luong Decl., Sept. 14, 2013, ¶¶ 5-7; Matthew Decl., Sept. 12, 2013, ¶¶ 5-7; Yount Decl., Nov. 16, 2013, ¶¶ 5-11; Chase Decl., Sept. 14, 2013, ¶¶ 6-7.)

Plaintiff also states that there are occasionally urgent patient care situations that require quick access to patient information, and that nurses will "call out and ask someone else to quickly look something up for them." (Yau Decl. ¶ 24.)  Additionally, Plaintiff states that it is common for Fillari, the burn unit supervisor, "to ask to jump on another nurse's mobile computer to look something up under that other nurse's log-in code." (Yau Decl. ¶ 30.)  Plaintiff argues that despite a well-known practice of accessing patient records using another care provider's log-in, Defendants never investigated the possibility that someone else had accessed M.C.'s record using her log-in.  Instead, Defendants terminated her, even though she asserted at the June 3, 2013 investigatory meeting that she did not recall accessing M.C.'s record.  Plaintiff denies having any personal reason to access M.C.'s records, as M.C. was not one of the patients about which Plaintiff raised patient care concerns to Defendants or to DPH.  Plaintiff also asserts that upon being reinstated, she was never offered remedial training regarding privacy issues or computer access policies, suggesting Defendants' real motive for her termination was retaliation, and not the alleged privacy violations.

In response, Defendants argue that M.C.'s record was accessed twice by someone using Plaintiff's credentials on February 1, 2013, and that each time the record was accessed, Plaintiff's username and password had to be entered.  If proven, this circumstantial evidence could undermine Plaintiff's theory that someone else accessed M.C.'s record by using her credentials.  It could also significantly buttress Defendants' argument that the decision to terminate Plaintiff was

24

made in good faith, as it was supported by solid proof.  However, all of the evidence cited to support that Plaintiff's log-in and password were used twice to access M.C.'s record on February 1, 2013 is based upon the audit logs attached as Exhibit F to Vickers's declaration.  The court has determined that those audit logs are inadmissible.  (*See* n.9, *supra*.)  For example, Gaines testified at the February 2014 arbitration that there were "two different accesses" to M.C.'s record, but her testimony was based on the inadmissible audit report.  (Feb. 15, 2014 Arbitration Tr. 157, 161-62.)  She also admitted that she did not participate in "the audit and determination of the accessing of the file." (Feb. 15, 2014 Arbitration Tr. 154.)  In her declaration, Vickers's description of Plaintiff's alleged access to M.C.'s record is based solely on review of the audit log.  (Vickers Decl. ¶ 22 ("Based on [Exhibit F], I concluded at the time that Plaintiff had accessed patient M.C.'s medical record twice for at least a two-minute period on February 1, 2013").).)

In fact, the only admissible evidence supporting Defendants' contention that Plaintiff accessed M.C.'s record on February 1, 2013 is Fillari's statement that she saw Plaintiff's name in M.C.'s record on May 10, 2013.  Her declaration is silent about the number of access attempts that she observed.  (Fillari Decl. ¶ 3.)  Accordingly, the testimony about Plaintiff purportedly logging into M.C.'s record twice on February 1, 2013 is inadmissible, since there is no evidence that the witnesses' understanding about the two alleged access attempts is based upon independent knowledge, separate from the audit logs themselves.[19]

At the hearing, Defendants argued that it is irrelevant whether Defendants were correct in concluding that Plaintiff had improperly accessed M.C.'s records; instead, the issue is whether Defendants *believed in good faith* that they had reached an accurate conclusion.  *See Morgan*, 88 Cal. App. 4th at 75 ("to avoid summary judgment . . . [a]n employee . . . can not simply show the employer's decision was wrong, mistaken, or unwise.  Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally

---

[19] The court's ruling that the audit logs are inadmissible for purposes of this motion is without prejudice to Defendants seeking to introduce the logs or the data contained therein at trial.  As noted, properly-authenticated, admissible evidence that Plaintiff's log-in and password were used twice to access M.C.'s record would significantly weaken Plaintiff's theory that another nurse accessed M.C.'s record using her log-in.

find them unworthy of credence." (internal citations and quotation marks omitted)).  According to

Defendants, "it is simply not believable" that St. Francis would risk exposure to fines and legal

action by reporting Plaintiff's HIPAA violations "just to hide its . . . retaliatory motive."  (Defs.'

Reply 6.)  Defendants also argue that Plaintiff has never denied accessing M.C.'s record on

February 1, 2013, stating that she "simply talks around the issue."  (Defs.' Reply 3.)

       A reasonable jury could accept Defendants' reporting of the HIPAA violation as evidence

of their good faith belief in the results of their investigation.  However, a reasonable jury could

also find that it was a well-known, common practice for employees to access patient files under

other employees' log-ins.  A jury could thus conclude that Defendants' failure to investigate such

a commonplace explanation demonstrates that Defendants did not act in good faith, instead

moving quickly to terminate Plaintiff even though she stated she did not remember accessing the

record.  Defendants place great emphasis on the fact that Plaintiff has never denied accessing

M.C.'s record, but a reasonable jury could conclude that this is consistent with her statement that

she does not recall doing so, accepting Plaintiff's explanation that she does not deny accessing the

record because she honestly does not recall doing so.  (*See* Yau Decl. ¶ 17 ("Since it is quite

common in the Burn Unit to quickly look up a record for another nurse, I did not want to say

anything until I had more information about the alleged incident.  I told the truth, which was that I

did not remember.").)

       In support of her pretext theory, Plaintiff also argues that her discipline was unprecedented.

Defendants identify five incidents involving breaches of the hospital's patient privacy policies

since 2009.  Two of the five employees were terminated, one resigned, and the employees

involved with the remaining two incidents received written discipline.  With respect to the three

terminated employees, one was fired in May 2013 after improperly accessing a patient's medical

record to compile evidence.  According to Gaines, the employee had been subject to discipline and

sought to explore whether other care providers had engaged in similar incidents of wrongdoing,

and transcribed details from a patient's file into a letter that he submitted to management.  He then

initially lied about having accessed the record but later admitted to the wrongdoing.  The second

employee resigned in June 2013, after learning he or she would be terminated.  That employee

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5

inappropriately accessed the record of a patient for whom the employee did not provide medical care and then discussed the patient's case in detail at a conference attended by over 150 people. The third employee was terminated after mistakenly transmitting confidential patient information to the wrong fax number on three separate occasions.  However, this employee was subjected to two levels of progressive discipline prior to termination.[20]

6
7
8
9
10
11
12
13
14
15
16
17
18

Plaintiff argues that her alleged privacy violations are not comparable to the three examples of employees who were terminated or resigned.  Unlike the two employees who intentionally accessed patient information to gather evidence or to discuss the case at a conference, Plaintiff has no memory of accessing M.C.'s record.  She maintains that she had no motive to do so, and disputes Defendants' evidence that she improperly accessed the record.  As to Plaintiff's disclosure of confidential patient information to her husband, there is no evidence that this disclosure was intentional or was caused by anything other than carelessness on Plaintiff's part.  In fact, Gaines admitted that she would not have made the decision to terminate Plaintiff had her only privacy violation been allowing her husband access to confidential patient information.  (Gaines Dep. 102-03.)  A reasonable jury could examine the circumstances of Plaintiff's alleged privacy violations and conclude that her immediate termination, without the implementation of progressive discipline, was out of line with the hospital's previous disciplinary practices in comparable situations, and that she was treated more harshly than others because of her complaints to the DPH.

19
20
21
22
23

In sum, the court finds that Plaintiff has raised a triable issue of fact as to whether Defendants' stated reasons for terminating her are pretext for retaliation for making protected complaints to the DPH.  Accordingly, summary judgment is denied as to her Labor Code section 1102.5 claim.

24
25
26
27
28

---

[20] With respect to the privacy incidents that did not result in termination, the first one involved two employees who made Facebook postings describing Emergency Department incidents, describing patient incidents in general terms and reflecting a negative attitude towards the population the hospital serves.  These employees received final written warnings.  As to the second incident, three employees received written discipline after posting on Facebook a group photograph of employees which included in the background their unit's "white board," which listed the names of patients on the unit, even though the patient names were illegible.

b.      **California Health & Safety Code section 1278.5**

Plaintiff's eighth cause of action is for violation of California Health and Safety Code section 1278.5.  This claim is based on Plaintiff's allegation that Defendants terminated her for reporting patient care issues to the DPH and for making internal IVOS complaints about patient safety.  (2d Am. Compl. ¶ 87.)

Section 1278.5 provides that

> [n]o health facility shall discriminate or retaliate, in any manner, against any . . . employee, member of the medical staff, or any other health care worker of the health facility because that person has . . . [p]resented a grievance, complaint, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity [or] [h]as initiated, participated, or cooperated in an investigation or administrative proceeding related to, the quality of care, services, or conditions at the facility that is carried out by an entity or agency responsible for accrediting or evaluating the facility or its medical staff, or governmental entity.

Cal. Health & Safety Code § 1278.5(b)(1)(A), (B).  The statute states that "whistleblower protections apply primarily to issues relating to the care, services, and conditions of a facility." Cal. Health & Safety Code § 1278.5(a).  To establish a prima facie case under section 1278.5, a plaintiff must show that (1) she engaged in a protected activity under the statute; (2) her employer subjected her to an adverse employment action; and (3) there is a causal link between the two. *Jadwin v. Cnty. of Kern*, 610 F. Supp. 2d 1129, 1144 (E.D. Cal. 2009) (citing *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1105 (9th Cir. 2008)).

Section 1278.5 provides that there is a "rebuttable presumption that discriminatory action was taken by the health facility . . . in retaliation against an employee . . . of the facility, if responsible staff at the facility or the entity that owns or operates the facility had knowledge of the actions, participation, or cooperation of the person responsible for [the grievance, complaint, or report] . . . and the discriminatory action occurs within 120 days of the filing of the grievance or complaint." Cal. Health & Safety Code § 1278.5(d)(1).  This rebuttable presumption is a presumption affecting the burden of producing evidence, Cal. Health & Safety Code § 1278.5(e) (citing Cal. Evid. Code § 603), which "disappears once contrary evidence is introduced whether or not the contrary evidence is sufficient under the appropriate standard of proof to disprove the

1    presumed fact." *In re Quentin H.*, 230 Cal. App. 4th 608, 615 n.6 (2014) (discussing difference

2    between presumptions affecting the burden of producing evidence and those affecting the burden

3    of proof).

4         As with Plaintiff's section 1102.5 claim, the parties do not address Plaintiff's prima facie

5    case.  Here, Plaintiff's protected activities are her patient care reports to the DPH as well as her

6    internal hospital complaints through IVOS.  As discussed above, Plaintiff contends she informed

7    those present at the June 3, 2013 meeting that she had contacted the DPH herself after learning of

8    her husband's complaint, and that she had subsequently filed two DPH complaints of her own.

9    Regarding the internal patient care and safety complaints, there is no dispute that Fillari knew

10   about them.  Plaintiff made some complaints directly to Fillari, and as the manager of the burn

11   unit, Fillari received all internal IVOS event reports made regarding her unit.  Additionally,

12   Morrissette testified that she was aware prior to Plaintiff's termination that Plaintiff had submitted

13   at least one internal report through IVOS.  Although Defendants claim that Gaines was the sole

14   decision maker, there is evidence that she consulted with both Fillari and Morrissette before

15   making the decision to terminate Plaintiff, and Plaintiff contends that this implies that their input

16   was considered in the termination decision.  Since Plaintiff was terminated on June 7, 2013, less

17   than 120 days after Plaintiff's March 18, 2013 IVOS complaint and first contact with the DPH on

18   March 19, 2013, the rebuttable presumption that Defendants unlawfully retaliated against Plaintiff

     applies.

19        The record contains contrary evidence rebutting this presumption.  According to

20   Defendants, Plaintiff was terminated for accessing patient records without a medical need to know

21   and disclosing confidential patient information to her husband.  Therefore, the presumption of

22   unlawful retaliation "disappears."  *See In re Quentin H.*, 230 Cal. 4th at 615 n.6.  As

23   discussed in connection with Plaintiff's section 1102.5 claim, Plaintiff has raised a triable issue of

24   fact as to whether the reasons for her termination were pretexts for unlawful retaliation.

25   Therefore, summary judgment is denied as to her section 1278.5 claim.

26        c.      **Wrongful Termination in Violation of Public Policy**

27        Plaintiff's claim for wrongful termination in violation of public policy claim is based in

28

United States District Court
Northern District of California

1    part on her section 1102.5 and section 1278.5 claims.  At the hearing, both parties acknowledged

2    that the wrongful termination claim rises or falls with the underlying statutory claims.  Since the

3    court denies summary judgment on those claims, it also denies summary judgment on Plaintiff's

4    wrongful termination claim based on those statutes.

5             **5.       After-Acquired Evidence**

6             Defendants argue that the doctrine of after-acquired evidence applies to bar certain

7    remedies for Plaintiff's claims for race and national origin discrimination and retaliation under

8    FEHA and Title VII, and Plaintiff's California Labor Code and Health and Safety Code

9    whistleblower claims.  According to Defendants, they obtained through discovery an email chain

10   between Plaintiff and a former St. Francis nurse, Karen Clark, which identifies a patient by name

11   and discusses specific details of the patient's medical history and medical condition.  (Gaines

12   Decl. ¶ 3 Ex. A.)  Defendants argue that the emails constitute "an egregious violation" of the

13   hospital's patient confidentiality policies meriting immediate termination, thus limiting the scope

14   and form of relief available to Plaintiff on these claims.[21]

15            "The 'after-acquired evidence' doctrine precludes or limits an employee from receiving

16   remedies for wrongful discharge if the employer later 'discovers' evidence of wrongdoing that

17   would have led to the employee's termination had the employer known of the misconduct."

18   *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1071 (9th Cir. 2004) (citing *McKennon v. Nashville Banner*

19   *Publ'g Co.*, 513 U.S. 352, 360-63 (1995)); *Salas v. Sierra Chem. Co.*, 59 Cal. 4th 407, 428-30

20   (2014.  "An employer can avoid backpay and other remedies by coming forward with after-

21   acquired evidence of an employee's misconduct, but only if it can prove by a preponderance of the

22   evidence that it would have fired the employee for that misconduct."  *O'Day v. McDonnell*

23   *Douglas Helicopter Co.*, 79 F.3d 756, 761 (9th Cir. 1996).  In cases where such evidence is

24   discovered, "neither reinstatement nor front pay is an appropriate remedy."  *McKennon*, 513 U.S.

25   at 362.  Instead, "the beginning point in the trial court's formulation of a remedy should be

26   calculation of backpay from the date of the unlawful discharge to the date the new information

27   _____

28   [21] Since the court grants summary judgment on Plaintiff's Title VII and FEHA claims, this
     discussion pertains only to her claims under sections 1102.5 and 1278.5.

United States District Court
Northern District of California

1   //

2   //

3   was discovered." *Id.*

4           Defendants assert that they became aware of the email in question on or about April 8,

5   2015.  The communications appear to be made from Plaintiff and Clark's personal email accounts,

6   including Plaintiff's Gmail account to which her husband had access, and are dated July 5, 2011

7   and February 21, 2013.  It appears that the entire email chain was forwarded to Plaintiff's email

8   account on July 11, 2014 with the sentence, "Important email found."  (Gaines Decl. Ex. A.)

9   According to Gaines, "[o]n its face," the emails are "a serious violation of patient privacy laws, as

10  well as Saint Francis Memorial Hospital's privacy policies," and she states that if she were

11  "presented with this matter to investigate now," she would "likely terminate" Plaintiff's

12  employment "given the severity of this incident alone."  (Gaines Decl. ¶¶ 6, 8.)  She also states

13  that Plaintiff's termination would be "all the more warranted" due to the fact that she has two

14  previous incidents of privacy violations.  (Gaines Decl. ¶ 8.)

15          The court finds that Defendants have not met their burden on summary judgment to show

16  that they would have terminated Plaintiff upon discovery of the after-acquired evidence.

17  Importantly, the emails do not show that Plaintiff herself transmitted any confidential patient

18  information by email to her former coworker; it was Clark who sent the confidential information

19  to Plaintiff.  It appears Plaintiff responded, nearly two years later, asking Clark to contact her, and

20  then forwarded the email chain to herself in July 2014.  In her declaration, Gaines acknowledges

21  that the patient information was first sent from Clark to Plaintiff, but states that Plaintiff

22  "republished this content" by forwarding it to herself on an email account shared with her

23  husband.  As discussed above, Defendants identify five incidents involving breaches of the

24  hospital's patient privacy policies since 2009; however, Defendants cannot point to any similar

25  breaches of privacy laws and policies that resulted in immediate termination.  Therefore, it is

26  possible that a reasonable jury could conclude that Plaintiff "republishing" confidential

27  information to herself, regardless of whether her husband had access to her email account, does

28  not justify termination.  Defendants have not proven that the undisputed facts show that they

*United States District Court*
*Northern District of California*

1  //

2  //

3  would have fired Plaintiff solely on the basis of this email chain.  Summary judgment is denied as

4  to Defendants' after-acquired evidence defense.

5          **6.      *Res Judicata***

6          Finally, Defendants argue that Plaintiff's claim for wrongful termination in violation of

7  public policy is barred by the doctrine of *res judicata*.  According to Defendants, in connection

8  with the union arbitration of Plaintiff's termination, the arbitrator determined that St. Francis had

9  "presented sufficient circumstantial evidence to prove [Plaintiff's] wrongdoing," including

10 accessing patient records without a business need to know and negligence in safeguarding

11 confidential patient information.  However, Plaintiff now uses her termination as the subject of her

12 claim for wrongful termination in violation of public policy.

13         In support, Defendants cite *Wade v. Ports America Management Corporation*, 218 Cal.

14 App. 4th 648, 656 (2013), in which the court held that "a labor arbitration award, pursuant to a

15 CBA, may bar the employee from bringing a common law claim alleging retaliation and wrongful

16 termination in violation of public policy, if the arbitration award addressed the same cause of

17 action."  In *Wade*, the arbitration specifically addressed the plaintiff's claims for racial

18 discrimination and retaliation for previous grievances based on racial discrimination, and the

19 arbitrator found there was "no compelling evidence" to support his claims.  218 Cal. App. 4th at

20 652, 657.  Therefore, the court held that his later claim for wrongful termination based on the same

21 conduct was barred because it was "within the scope of the [arbitration], related to the subject-

22 matter and relevant to the issues."  *Id*. at 658 (citation omitted).  By contrast, the only claim at

23 issue in Plaintiff's arbitration was whether Defendants violated the "just cause" provision in the

24 collective bargaining agreement in terminating Plaintiff's employment.  (April 14, 2014 Decision

25 and Award 2.)  The arbitrator did not consider Plaintiff's whistleblower claims under California

26 Labor Code section 1102.5 and Health and Safety Code section 1278.5.  Accordingly, the court

27 finds that Plaintiff's wrongful termination claim is not barred by the doctrine of *res judicata*.

                          **V. Conclusion**

28

32

United States District Court
Northern District of California

1    For the foregoing reasons, Defendants' motion for summary judgment is granted in part

2    and denied in part.

3

4    **IT IS SO ORDERED.**

5

6    Dated: June 11, 2015

7    

8    Donna M. Ryu
     United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

33